IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MARY ANN DAVIS                    )
                                  )
v.                                )    No. 2:06-0023
                                  )    Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION    )

To:  The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB"), as provided under Title II of the
Social Security Act ("the Act"), as amended.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record and supporting memorandum (Docket Entry
Nos. 10, 11), to which defendant has responded (Docket Entry No.
17).  Upon consideration of these papers and the transcript of
the administrative record, and for the reasons given below, the
undersigned recommends that plaintiff's motion be **DENIED**, and
that the decision of the Commissioner be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed her DIB application on November 15,
2002, alleging disability since February 1, 2000 (Tr. 151-53),

1

due to thyroid cancer, diabetes, arthritis, knots in her lymph nodes, muscle pain, heart disease, blood clots, and depression (Tr. 156). The claim was denied at the initial and reconsideration stages of agency review (Tr. 130-37, 140-41), and plaintiff thereafter filed a request for hearing and *de novo* review before an Administrative Law Judge ("ALJ"). Plaintiff appeared with counsel at the hearing on April 7, 2004, and testimony was received from plaintiff, her husband, and an impartial vocational expert ("VE") (Tr. 551-87). The ALJ took the case under advisement until October 8, 2004, when he issued a written decision (Tr. 112-21) denying plaintiff's application for benefits. The decision contains the following enumerated findings:

1.  The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 2003.

2.  The claimant has engaged in substantial gainful activity since the alleged onset of disability with such described employment activity considered an unsuccessful work attempt.

3.  The claimant's thyroid cancer status post thyroidectomy; non-insulin dependent diabetic mellitus; and cardiac problems, are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Her mental disorders impose no more than mild restrictions of activities of daily living; mild to moderate limitation in the ability to maintain social functioning, and mild

2

to moderate limitation in the ability to maintain
concentration, persistence, and pace.  She has had no
extended episodes of mental decompensation, and she
functions adequately outside of a highly supportive
setting.

5.    The undersigned finds the claimant's allegations
      regarding her limitations are not totally credible for
      the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity to
      lift/carry 20 pounds occasionally and 10 pounds
      frequently, and to sit or stand/walk each for as many
      as 6 of 8 hours.  Her intermittent emotional (non-
      exertional) impairment does not significantly
      compromise the capability to perform past relevant
      work.

7.    The claimant's past relevant work as photo finisher did
      not require the performance of work-related activities
      precluded by her residual functional capacity (20 CFR §
      404.1565).

8.    The claimant's medically determinable thyroid cancer
      status post thyroidectomy ; non-insulin dependent
      diabetic mellitus; cardiac problems, and anxiety
      related disorder do not prevent the claimant from
      performing her past relevant work.

9.    The claimant was not under a "disability" as defined in
      the Social Security Act, at any time through September
      30, 2003, the date last insured.  (20 CFR §
      404.1520(f)).

(Tr. 120-21)

        On January 31, 2006, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr.

101-04), thereby rendering that decision the final decision of

the Commissioner.  Though plaintiff thereafter requested that the

Appeals Council reopen her claim to consider new evidence (Tr.

10), this request was denied on April 9, 2006, on grounds that

3

the new evidence did not relate back to the relevant period prior
to plaintiff's date last insured (Tr. 8-9).  This civil action
was thereafter timely filed, and the Court has jurisdiction.  42
U.S.C. § 405(g).  If the Commissioner's findings are supported by
substantial evidence, based on the record as a whole, then these
findings are conclusive.  Id.


## II.  REVIEW OF THE RECORD

        The following summary of the evidence is taken, with
few modifications, from plaintiff's memorandum (Docket Entry No.
11 at 2-10):

        The plaintiff, Mary Ann Davis, is a 42-year-old woman
with a limited (tenth grade) education.  (Tr. 556-557).  She
alleges the inability to sustain substantial gainful activity
since February 2000 due to thyroid cancer, hyperthyroidism,
diabetes, arthritis, shortness of breath, fatigue, and
depression.  In the vocationally relevant past, Ms. Davis worked
as a photo finishing laboratory worker, a job classified by the
vocational expert as light and semiskilled.  (Tr. 584).  None of
Ms. Davis's other jobs lasted long enough to constitute
substantial gainful activity.  (Tr. 563).

        Ms. Davis had a cervical MRI in February 2001 due to
neck pain, bilateral hand numbness, and leg pain.  (Tr. 353).
The MRI showed mild approaching moderate acquired stenosis at C5-

4

6 with at least mild ventral cord impingement.

In April 2001, Ms. Davis saw her primary care physician, Dr. Marketa Kasalova, with heart palpitations, shortness of breath, and chest pain. (Tr. 293). Lab results revealed hyperthyroidism and possible Hashimoto thyroiditis, and Ms. Davis was started on Synthroid. Ms. Davis went to the emergency room in May 2001 due to dizziness and a fast heart rate. (Tr. 338-41). Blood tests showed high blood sugar, and an EKG showed sinus tachycardia. (Tr. 339). A thyroid ultrasound showed multiple thyroid nodules bilaterally. (Tr. 335). The results of a thyroid scan were consistent with an early autonomous nodule and a multinodular goiter, or thyroiditis. (Tr. 331).

Dr. Joseph Tokurak, an endocrinologist, began seeing Ms. Davis in May 2001 on a referral from Dr. Kasalova for assessment of suspect hyperthyroidism. (Tr. 289). Lab results revealed elevated thyroid stimulating immunoglobins consistent with Graves disease, as well as abnormal glucose tolerance. (Tr. 278, 288). Dr. Tokurak started Ms. Davis on Glucophage and sent her to Dr. Richard Goldstein for consideration of thyroid surgery. (Tr. 278, 288).

Dr. Goldstein performed a near-total thyroidectomy in December 2001. (Tr. 276). Pathology results revealed papillary carcinoma, follicular variant. (Tr. 275). Ms. Davis opted to

5

pursue radioactive iodide ablation treatment. (Tr. 268, 287). Dr. Tokurak discontinued Synthroid and prescribed Cytomel. (Tr. 287).

Ms. Davis was hospitalized in February 2002 to begin radioiodine I-131 therapy. (Tr. 266). A whole body scan showed increased activity in the region of the thyroid bed thought to represent residual thyroid tissue or metastatic disease. (Tr. 264). Dr. Goldstein opined that these results were most consistent with residual normal thyroid tissue. (Tr. 257). Ms. Davis was to continue taking Levoxyl. (Tr. 262, 284).

Ms. Davis saw Dr. Kasalova in May 2002 with muscle pains, weakness, and depression. (Tr. 312). She saw Dr. Don Arms, an orthopedic specialist, regarding her right knee and left toe. (Tr. 281). There was mild to moderate osteoarthritis in her right knee and a fourth hammertoe deformity leading to hyperkeratotic lesion. (Tr. 281).

When Dr. Tokurak saw Ms. Davis in July 2002, her serum calcium was below normal. (Tr. 283). He ordered blood tests and then referred Ms. Davis to Dr. Chilango Mulaisho, an endocrinologist. (Tr. 376). Dr. Mulaisho opined that Ms. Davis's TSH and thyroglobulin were in the appropriate range for follicular carcinoma. He ordered a thyroid ultrasound and continued Levoxyl. (Tr. 376). The thyroid ultrasound showed no lymphadenopathy. (Tr. 375).

6

Because of Ms. Davis's complaints of chest pain and dyspnea, Dr. Kasalova ordered an EKG and stress test in September 2002. (Tr. 433). She then referred Ms. Davis to cardiologist Dr. Eyad Aljamal due to an abnormal stress test. (Tr. 433). Dr. Aljamal noted an abnormal EKG response but a normal exercise test. (Tr. 435). He recommended cardiac catheterization. An echocardiogram showed normal LV systolic function and a mild degree of tricuspid valve regurgitation. (Tr. 297).

Dr. Joel Tanedo, another cardiologist, saw Ms. Davis in October 2002. (Tr. 366). She had not had any further chest pain; she reported fatigue, which Dr. Tanego felt was probably due to hypothyroidism. He prescribed aspirin and nitroglycerin as needed. (Tr. 367).

In November 2002, Ms. Davis saw Dr. Kasalova due to a nodule under her left arm. (Tr. 449). A breast ultrasound was negative but showed an enlarged reactive left axillary lymph node. (Tr. 447). In December 2002, Ms. Davis reported fatigue, malaise, and dyspnea as well as depression and anxiety. (Tr. 445). Dr. Kasalova increased Glucophage and Paxil. (Tr. 446).

A whole body scan in December 2002 showed faint increased activity in the cervical area possibly representing residual carcinoma. (Tr. 373). Dr. Mulaisho opined that the test results taken together did not indicate evidence of metastatic disease outside the thyroid bed or significant thyroid

7

tissue within the thyroid bed. (Tr. 371). He continued to prescribe Levoxyl.

Dr. Donita Keown performed a consultative examination in December 2002. (Tr. 390). Ms. Davis reported that, since her treatment for thyroid cancer, she had been fatigued and had poor concentration. She also complained of arthritis pain. (Tr. 391). Dr. Keown noted that Ms. Davis appeared depressed and needed psychological evaluation. (Tr. 393-394). She opined that Ms. Davis could sit, stand, or walk for at least six hours, frequently lift 15 to 20 pounds, and occasionally lift 35 to 40 pounds. (Tr. 394).

Psychological examiner Stephen Hardison performed a consultative evaluation in January 2003. (Tr. 396). On mental status evaluation, Ms. Davis's immediate concentration and attentional skills appeared somewhat limited and her abstract reasoning skills appeared fair. (Tr. 398). Mr. Hardison felt that Ms. Davis's intellectual functioning was in the low average to average range. His diagnosis was anxiety disorder NOS. He assessed Ms. Davis as having the ability to understand and remember basic instructions adequately. (Id.). Her immediate concentration and attention skills appeared somewhat limited, and she reported problems with sustained concentration and forgetfulness. (Tr. 398-99). She also reported social withdrawal. (Tr. 399). Mr. Hardison further opined that Ms.

8

Davis's ability to maintain emotional stability on a consistent basis was fair in a low stress environment. He felt that she could learn fairly structured and routine job tasks, and he noted that she might have some problems with sustained concentration and attention. (Id.).

In January 2003, Dr. Kasalova saw Ms. Davis with pain in her left arm, fatigue and malaise, and chest pain. (Tr. 443). She sent Ms. Davis to the emergency room for further evaluation. (Tr. 444, 514). The next day, Ms. Davis was evaluated at Crossville Cardiology for recurrent episodes of chest pain consistent with angina pectoris. (Tr. 429). Dr. Aljamal performed cardiac catheterization, which showed no significant coronary artery disease and normal LV systolic function. (Tr. 461-62). In March 2003, Ms. Davis reported burning in her upper chest despite taking Nexium. (Tr. 426). Dr. Aljamal felt that she was stable from a cardiac standpoint. (Tr. 427).

Dr. Kasalova continued to monitor Ms. Davis's condition. (Tr. 439-442). She ordered a bilateral venous lower extremity ultrasound in April 2003 due to swelling and pain in the left leg and lower back. (Tr. 532). There was no evidence of deep vein thrombosis; there was some incompetence in the left greater saphenous vein at the ankle. Lumbar spine x-rays showed mild to moderate degenerative changes. (Tr. 531).

When she returned to Dr. Mulaisho in May 2003, Ms.

9

Davis stated that she was tired all of the time and had a sore spot in her throat. (Tr. 497). In June 2003, Dr. Mulaisho reassured Ms. Davis of normal thyroid function; he opined that her symptoms could be secondary to depression or possible perimenopausal symptoms. (Tr. 496). Dr. Mulaisho completed a medical assessment indicating manipulative restrictions. (Tr. 492-94).

Dr. Tokurak continued to see Ms. Davis. (Tr. 502-511). In July 2003, lab results showed elevated fasting blood sugars. (Tr. 504). He added Glucophage and continued Glucovance. He also increased Levoxyl due to increased TSH. (Tr. 505). In August 2003, Ms. Davis complained of diarrhea on Glucophage. (Tr. 506). She also reported episodes of shortness of breath. Dr. Tokurak increased Levoxyl. (Id.).

In August and September 2003, Ms. Davis went to the Personal Growth and Learning Center for problems with anxiety. (Tr. 483-90).

In September 2003, Ms. Davis began seeing Dr. David Henson, a pulmonologist, for complaints of shortness of breath and increasing peripheral edema. (Tr. 469). Her medications included Levoxyl, Paxil, Glucovance, Celebrex, Sinemet, Dicyclomine, NTG, Tagamet, and Novalog insulin. Dr. Henson's examination revealed 1+ bilateral equal pitting peripheral edema, left somewhat greater than right. (Tr. 471). Laboratory results

10

showed a mildly elevated sedimentation rate. Pulmonary function testing revealed mild restrictive lung disease with mild air trapping. (Tr. 476). Dr. Henson ordered further testing to determine the etiology of Ms. Davis's symptoms. He diagnosed probable restless leg syndrome. (Tr. 471). A Methocholine challenge test was positive, and Dr. Henson prescribed Combivent MDI. (Tr. 474). In December 2003, Dr. Henson changed Combivent to Albuterol and Singulair due to complaints of nausea. (Tr. 468). His diagnoses were restrictive airway disease and asthma.[1]

In February 2004, Dr. Henson's office completed a medical assessment (signed by a nurse practitioner) in which Ms. Davis was described as being able occasionally to lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand or walk for at least two hours (with walking limited more than standing). (Tr. 479-81). Pushing or pulling with the extremities was permissible unless her asthma was exacerbated or unless there was vigorous pushing/pulling. (Tr. 480). The assessment cited asthma, shortness of breath, and positive Methylcholine test (indicating that certain exposures could trigger asthma). Ms. Davis's shortness of breath was often severe enough to interfere with attention and concentration, and she was likely to be absent

---

[1]The ALJ found that plaintiff's asthma did not surface as a severe impairment prior to her date last insured (Tr. 117). Though plaintiff argues that the ALJ did not give due consideration to her subjective complaint of shortness of breath, she does not contest his finding as to the nonseverity of her asthma during the period relevant to her DIB claim.

11

about twice a month.  Ms. Davis's ability to do postural or manipulative activities was not limited unless she experienced an exacerbation of asthma.  (Tr. 480-81).  Similarly, her ability to speak could be limited when her asthma was exacerbated.  (Tr. 481).  As to environmental limitations, Ms. Davis was to avoid all exposure to extreme cold or heat, dust, humidity/wetness, fumes/odors/dusts/gases, perfumes, solvents or cleaners, soldering fluxes, cigarette smoke, or chemicals.  Exposure to these irritants could result in shortness of breath and bronchial constriction.  (Tr. 481).

    At the hearing on April 7, 2004, Ms. Davis testified that she had quit working regularly in February 2000 due to thyroid problems, diabetes, arthritis, and asthma.  (Tr. 564-65).

    As to her thyroid problems, Ms. Davis stated that she had first noticed problems breathing; she had the shakes and could not sleep.  (Tr. 565).  She also had muscle problems, with pain in her legs and arms and difficulty walking at times.  (Tr. 566).  Since her thyroid cancer, Ms. Davis had been moody and found it hard to think.  She worried about a recurrence of cancer and had problems concentrating.  (Tr. 566-67).  Her family members complained about her mood swings.  (Tr. 567).

    Ms. Davis also stated that she felt fatigued all of the time; she woke up tired and the fatigue would get worse as the day progressed.  (Tr. 567).  Ms. Davis would sometimes lie down

12

two or three times a day for 15 to 20 minutes at a time. She
often did not have the energy to do her normal activities; her
lack of energy was worse when she tried to do housework. (Tr.
568). A fifteen- to twenty-minute rest would give her some
relief. At times, she was so fatigued that she would have to
stop whatever she was doing and close her eyes. (Id.). Ms.
Davis described her problems with restless leg syndrome. (Id.).
Her legs would jerk and shake, and they ached. (Tr. 569). This
would occur every night and during the day. These episodes would
last 15 minutes or so and would cause her to wake up at night.
During the day, the episodes would occur three or four times a
day for varying lengths of time, from 5 to 20 minutes. (Tr. 569-
70). Ms. Davis experienced cramps in her legs and feet and would
have to get up and walk around. (Tr. 570).

Ms. Davis had pain from arthritis in her left hip, for
which she took pain medications and used a heating pad. (Tr.
570). The pain was constant but varied in intensity. When she
sat for more than 30 minutes, the pain would worsen. (Tr. 571).
The pain medications did not provide much relief and caused
stomach problems. Changing position or using a heating pad
provided some relief. (Tr. 571-572).

As to her breathing problems, Ms. Davis testified that
exposure to certain substances exacerbated her shortness of
breath. (Tr. 572). Problematic substances including cleaning

13

solutions, air fresheners, and pollen.  Walking for more than 10
or 15 minutes caused worsening shortness of breath, as did
changes in the weather.  (Tr. 572-73).  When lying down, Ms.
Davis had to use a big pillow.  (Tr. 573).  Her breathing
problems were also exacerbated by stress; she would get nervous
and short of breath.  Ms. Davis became short of breath after
climbing three or four steps.  (Tr. 573-74).  When she went into
stores, being around chemicals (such as cleaning supplies) would
cause problems for her.  (Tr. 574).

       Ms. Davis testified that she had been on insulin for
diabetes for about six months at the time of the hearing.  (Tr.
574).  Her thyroid level contributed to lack of control of her
blood sugars.  (Tr. 566).  Her blood sugar still was not under
control and would run high between 147 to 289.  (Tr. 575).  When
her blood sugar was over 200, Ms. Davis had bad headaches and her
eyes would not focus.  (Id.).

       As to her household activities, Ms. Davis testified
that she tried to do chores such as laundry and cooking.  (Id.).
She could not do all of the laundry; she had difficulty getting
clothes out of the washer and putting them into the dryer.  This
caused muscle pain.  (Id.).  Ms. Davis did not vacuum or mop.
(Tr. 576).  She tried to cook a meal two or three times a week.
When she cooked, Ms. Davis sometimes became so tired that someone
else would have to finish the task.  She did not do yard work.

14

(Id.).  Ms. Davis would go into the grocery store to get a few items, but would get short of breath and tired.  (Tr. 577).  She did not attend church on a regular basis because she had difficulty sitting through a service due to arthritis in her hip. Ms. Davis did not visit with friends.  (Id.).

On a typical day, Ms. Davis stayed around the house and did housework for about 45 minutes throughout the day.  (Tr. 577-78).  The rest of the time, she would just lie around.  (Tr. 578).

Ms. Davis's husband testified that his wife had difficulty walking and sitting.  (Tr. 578).  She could only work for a few minutes, then she would sit for 15 to 20 minutes, and then lie on the couch and take a nap.  Mr. Davis reported that his wife would "go off" on him and would become angry very quickly.  (Tr. 579).  Before her thyroid surgery, Ms. Davis had not been this way.  She also had outbursts directed at other people in the household.  (Tr. 580).  Ms. Davis did not have any interest in doing things outside the home and did not seem to have the energy to do anything.  (Id.).

The vocational expert testified that Ms. Davis's past work as a photo finishing laboratory worker, DOT #976.687-018, was light and semiskilled (SVP 3).  (Tr. 584-85).  The VE testified that Ms. Davis could not return to her past work or do any other work if, as she testified, she needed to alternate

15

sitting, standing, and lying down and would have to lie down as much as four times a day for 15 minutes at a time. (Tr. 586).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v.

16

<u>Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the
record was not considered as a whole, the Commissioner's
conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human
Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

    B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an
entitlement to benefits by proving his or her "inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level
of review, the claimant's case is considered under a five-step
sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment,
     it must be determined whether he or she suffers from one of
     the "listed" impairments[2] or its equivalent; if a listing is
     met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level
     impairments, it must be determined whether the claimant can
     return to the job he or she previously held in light of his
     or her residual functional capacity (e.g., what the claimant
     can still do despite his or her limitations); by showing a
     medical condition that prevents him or her from returning to

_____

      [2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. <u>See</u> <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of

18

all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  <u>See</u> 42 U.S.C. § 423(d)(2)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff argues that the ALJ erred in rejecting her subjective complaints, including shortness of breath and fatigue, when he emphasized a more robust level of daily activity than plaintiff's hearing testimony supports.  She further argues that the ALJ's acknowledgment of plaintiff's willingness to work sporadic, five- or six-hour shifts as a substitute cafeteria worker was misplaced within the analysis of her ability to do substantial gainful activity on a regular and continuing basis.  Finally, plaintiff argues that her ability to perform such regular and continuing work is compromised by a level of fatigue not recognized by the ALJ, but which is supported by both the medical evidence and her hearing testimony.  As detailed below, the undersigned finds no reversible error on any of the grounds advanced by plaintiff.

While the undersigned agrees that plaintiff's hearing testimony portrayed a greater level of difficulty in her accomplishment of household chores and other tasks than that acknowledged in the ALJ's decision, it is clear that the ALJ did not merely gloss over plaintiff's description of such qualified abilities at her April 2004 hearing, as he recounted her

19

description at the third page of his decision (Tr. 114). Rather, it appears that he found the differing report plaintiff offered to the consultative psychological examiner more credible, as the finding of her reported activities to include cooking, shopping, laundry, driving, attending church, visiting friends and relatives, dusting, vacuuming, reading, and watching television is largely consistent with plaintiff's report to the examiner during her insured period (Tr. 397-98). It is the province of the ALJ to resolve conflicts in the evidence and to determine the credibility of witnesses who appear before him, and such findings are due considerable deference upon judicial review. See, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003); Moon v. Sullivan, 923 F.2d 1175, 1183 (6th Cir. 1990). Although the ALJ may have overstated plaintiff's reported abilities somewhat by failing to note that she told the psychological examiner that she did her chores slowly due to her thyroid problems and shortness of breath, and that she was only productive 2-3 days per week (id.), the undersigned does not find this failure to so undermine the ALJ's decision as to require a readjudication of plaintiff's credibility. This is particularly so in view of plaintiff's ability to work five- to six-hour shifts as a substitute cafeteria worker when called upon to do so. While the ALJ would certainly have been remiss in regarding this shift work as proof positive of plaintiff's ability to

20

perform substantial gainful activity, he did not do so.  Rather,
the ALJ appropriately regarded this cafeteria work as "an
unsuccessful work attempt ... [to be considered] along with the
overall record including clinical and diagnostic findings..."
(Tr. 113).  Reasonably considered as such, these work endeavors,
along with plaintiff's reported activity level and the consensus
of medical sources during the relevant period that plaintiff's
enduring symptoms were not totally disabling (e.g., Tr. 394, 492-
94), lend substantial evidentiary support to the ALJ's decision
to discredit plaintiff's more dire subjective complaints.

        Finally, while plaintiff's fatigue is documented in the
medical and testimonial record, it cannot be said that the
documentation supports a disabling level of fatigue, in view of
the evidence discussed above and medical recommendations such as
Dr. Tanedo's, for plaintiff to engage in moderate regular
exercise after he observed that she was reportedly "able to do
her activities of daily living and work without difficulty" but
with "some fatigue" (Tr. 366-67).  Plaintiff's alleged shortness
of breath finds less support in the medical record (e.g., Tr.
393-93), and in any event is far from a significant contributor
to her allegedly disabling combination of impairments during the
period prior to September 30, 2003:  though plaintiff complained
of being short of breath in association with her other initial
thyroid problems (Tr. 293, 565), this symptom did not prompt

21

plaintiff to seek any more focused medical treatment until September 4, 2003, when she presented to a pulmonologist, Dr. Henson, with "a sudden onset of shortness of breath" and "increasing peripheral edema which also is new." (Tr. 469) Even then, pulmonary function testing revealed only mild restrictive airway disease with mild air trapping (Tr. 476). Further testing revealed that plaintiff had asthma which would flare up with exposure to certain irritants (Tr. 474, 480-81), resulting in the prescription of medicines to manage those symptoms (Tr. 468). However, the record does not support the consideration of plaintiff's asthma-related symptoms and treatment as relevant to her ability to work prior to September 30, 2003.

In sum, the undersigned concludes that substantial evidence supports the ALJ's decision in this case, and that the decision should therefore be affirmed.

## IV.   RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections

22

shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

      **ENTERED** this 5th day of March, 2008.

                                    s/ John S. Bryant
                                    JOHN S. BRYANT
                                    UNITED STATES MAGISTRATE JUDGE

Case 2:06-cv-00023   Document 18   Filed 03/05/08   Page 23 of 23 PageID #: 76